# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BRENDA BOUGHTER, | ) | CASE NO. 1:16CV733 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Brenda Boughter ("Plaintiff" or "Boughter"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be REVERSED and the case REMANDED

for further proceedings consistent with this Opinion.

## I.   PROCEDURAL HISTORY

In July 2012, Boughter filed applications for POD and DIB**,** alleging a disability onset

date of September 1, 2010 and claiming she was disabled due to "multiple joint arthritis, lumbar

spine impairment, severe back pain, left knee impairment, right knee impairment, soft tissue

injuries of the ankle requiring multiple procedures, Hypertensive Cardiovascular

Disease/Hypertension, Meniere's Disease."  (Transcript ("Tr.") 23, 90-91, 168.)  The

applications were denied initially and upon reconsideration, and Boughter requested a hearing

before an administrative law judge ("ALJ").  (Tr.  114-122, 124-131.)

On August 12, 2014, an ALJ held a hearing, during which Boughter, represented by

counsel, and an impartial vocational expert ("VE") testified.  (Tr. 42-89.)  On November 25,

2014, the ALJ issued a written decision finding Boughter was not disabled.  (Tr. 23-35.)  The

ALJ's decision became final on February 25, 2016, when the Appeals Council declined further

review.  (Tr. 1-6.)

On March 24, 2016, Boughter filed her complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15.)

Boughter asserts the following assignments of error:

(1)     The ALJ erred failed [sic] to assign appropriate weight to the opinion of
        Ms. Boughter's treating physician and, as a result, erred in her assessment
        of residual functional capacity.

(2)     New and material evidence warrants remand.

(Doc. No. 13.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Boughter was born in October 1959 and was fifty-four (54) years-old at the time of her

administrative hearing, making her a person closely approaching advanced age under social

security regulations.  (Tr. 90.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  She has a high

school education and is able to communicate in English.  She has past relevant work as a bartender and in sales.  (Tr. 76-77.)

## B.    Medical Evidence

Boughter presented to primary care physician Judith K. Waters, M.D., on May 23, 2011 for treatment of a variety of issues, including bilateral knee pain, hypertension, hyper cholesterolemia, fatigue, and difficulty losing weight.  (Tr. 270.)  She reported knee discomfort "to the extent that it is very hard for her to walk and to participate in exercise."  (*Id.*)  On examination, Dr. Waters noted no edema, normal pulse and reflexes, and a "straight and steady" gait.  (*Id.*)  She observed "some crepitance bilaterally and some discomfort along the joint line." (*Id.*)  She assessed probable osteoarthritis, ordered x-rays, and recommended regular exercise. (*Id.*)

On June 16, 2011, Boughter underwent x-rays of her bilateral knees and left ankle.  (Tr. 312-314.)  The knee x-rays showed tricompartmental osteoarthritis greatest in the medial compartment.  (Tr. 312-313.)  The left ankle x-ray revealed (1) lateral soft tissue thickening, and (2) probable prominent os navicularis.  (Tr. 314.)

The following month, Boughter presented to Mark Panigutti, M.D.  (Tr. 272, 339.)  On examination, Dr. Panigutti noted right knee tenderness, varus deformity, minimal flexion contracture, and no effusion or instability.  (Tr. 339.)  He interpreted Boughter's x-rays as showing "bone on bone wear of the medial aspect of the right and moderate wear of the medial aspect of the left."  (Tr. 339, 340.)  Dr. Panigutti diagnosed moderate to severe arthritis in both knees, administered a cortisone injection to Bougher's right knee, and recommended she participate in a warm pool therapy program.  (Tr. 272, 339.)

Boughter returned to Dr. Waters on July 29, 2011, requesting pain medication.  (Tr. 284.)
Dr. Waters noted Boughter "is going to need knee replacements eventually."  (*Id*.)  She
prescribed Naprosyn and "stressed the importance of reducing the BMI."  (*Id*.)  The record
reflects Dr. Panigutti thereafter administered a series of three injections to Boughter's right knee
in September and October 2011.  (Tr. 341-343.)

On December 7, 2011, Boughter presented to Dr. Waters with complaints of right ear
pain and congestion.  (Tr. 280.)  Dr. Boughter assessed bilateral otitis media and upper
respiratory infection, and prescribed antibiotics.  (*Id*.)  Boughter returned to Dr. Waters several
weeks later, on December 23, 2011, with continuing complaints of ear pain and pressure.  (Tr.
278.)  Dr. Waters diagnosed serous otitis and recommended another round of antibiotics.  (*Id*.)

On February 13, 2012, Boughter returned to Dr. Waters complaining of both right ear
pain and pain in the knee.  (Tr. 276.)  Boughter reported Naprosyn worked very well for her and
that she used Vicodin "only very sparingly, maybe, once or twice a week to take the edge [off]."
(*Id*.)  She continued to complain of right ear pain, stating that "it feels quite miserable."  (*Id*.)
Dr. Waters assessed right knee osteoarthritis, and advised Boughter to continue with the
Naprosyn and Vicodin.  (*Id*.)  As for Boughter's ear, Dr. Waters prescribed additional
antibiotics.  (*Id*.)

Boughter thereafter presented to Mark J. Wladecki, M.D., for evaluation of vertigo,
ringing in her ear, and decreased hearing on the right side.  (Tr. 298.)  Dr. Wladecki sent her for
an audiogram, "which was very interesting in that it showed she had a big difference between
her right and left ear in regards to where she can actually hear."  (*Id*.)  Specifically, he noted that
Boughter had a 40 decibel hearing loss on average in her right ear versus only a 10 decibel loss

4

on the left.  (*Id.*)  Dr. Wladecki prescribed Trental, Niaspan, lipoflavonoids, and zinc.  (*Id*.)

Boughter thereafter underwent an MRI of her brain on March 12, 2012, which showed (1) focal signal abnormalities on the FLAIR sequence in the brainstem at the level of the tectum and in the deep white matter of the right parietal lobe; and (2) an enhancing mass in the CP angle on the right involving the seventh/eighth nerve complex consistent with the patient's history of acoustic schwannoma.  (Tr. 305-306.)

On April 3, 2012, Boughter presented to Cliff A. Mergerian, M.D., for consultation regarding her hearing loss and "possible acoustic tumor."  (Tr. 294-295.)  Dr. Mergerian found that the MRI showed "no evidence of an acoustic tumor," believing it possible that the MRI showed a high jugular bulb on the right.  (*Id*.)  He recommended "watchful waiting" and a repeat MRI in six months.  (Tr. 294-295.)  Dr. Mergerian also recommended Boughter consider hearing aides for her right ear.  (Tr. 295.)

Boughter returned to Dr. Waters with complaints of foot pain, headache, abnormal weight gain, and "multiple other issues."[1]  (Tr. 363-364.)  With regard to Boughter's pain, Dr. Waters noted that Boughter's "knee is quite worn and the cartilage is quite worn and she is bone-on-bone and she has not had any calf tenderness or swelling."  (Tr. 363.)  Boughter reported instability and pain when she first stands up, as well as fatigue and light headedness.  (*Id*.)  She also complained of bilateral foot pain with "pins and needle type sensation as well as pain and throbbing particularly at the end of the day making walking difficult."  (*Id*.)

---

[1]  Dr. Waters' treatment note is undated.  Boughter believes it is from July 2012.  (Doc. No. 13 at 6.)  Based on the content of the treatment note, Boughter's visit would appear to have occurred sometime after December 2011 but before her April 2012 visit to Dr. Mergerian.  (Tr. 363.)

On examination, Dr. Waters noted "very minimal +1 edema" and "subjective tingling in her feet." (*Id*.)  She also noted symmetrical pulses and strength, normal reflexes, and intact sensation. (*Id*.)  Dr. Waters assessed possible diabetic neuropathy and "significant osteoarthritis, which may also be the cause of her foot pain." (Tr. 364.)  She ordered x-rays of Boughter's feet, discontinued Naprosyn, prescribed Motrin 800 mg., and provided Boughter with a handicap parking sticker. (*Id*.)

In August 2012, Boughter underwent an injection of her right knee "for arthritis management." (Tr. 344.)  She also underwent x-rays of her bilateral ankles and feet. (Tr. 308-311.)  The left ankle x-ray showed "a prominent osseous structure at the medial aspect of the ankle adjacent to the navicular . . . and most consistent in appearance with a prominent os navicularis." (Tr. 308.)  The right ankle showed a "prominent bony structure on the medial aspect of the ankle adjacent to the navicular similar to the finding in the left ankle." (Tr. 309.)  The x-rays of Boughter's feet showed large (left foot) and prominent (right foot) os navicularis. (Tr. 310-311.)

The following month, Boughter underwent nerve conduction velocity ("NCV") and electromyographic ("EMG") testing. (Tr. 316-317.)  The EMG showed slight radiculopathy at the lumbosacral root involving primarily the L5 root bilaterally. (*Id*.)  The NCV study was "within normal range in lower leg segment," however, it was thought that the sensory potentials "might suggest sensory nerve peripheral neuropathy in the lower extremities." (Tr. 317.)

On October 25, 2012, Boughter presented to pain management specialist David M. Sfeir, M.D. (Tr. 345.)  She reported bilateral lower extremity pain that was aggravated by sitting and lying down, and "relieved somewhat by moving around and Neurontin." (*Id*.)  She also

6

complained of numbness and tingling and a pins and needles sensation into her lower extremities.  (*Id*.)  On examination, Dr. Sfeir noted positive straight leg raise bilaterally and decreased neurosensory in the bilateral lower extremities.  (*Id*.)  Dr. Sfeir ordered a repeat MRI and stated Boughter "may be a candidate for a trial of caudal epidural steroid injections in hopes of decreasing pain and increasing her tolerance to physical therapy."  (*Id*.)

Boughter returned to Dr. Waters on January 8, 2013.  (Tr. 362.)  She stated her foot pain "has gotten somewhat better since she saw the Pain Management and had joint injections and had epidural blocks."  (*Id*.)  Boughter still, however, reported joint pain and weakness, excessive fatigue, and discomfort with "moving and walking."  (*Id*.)  Dr. Waters noted normal strength and neurological signs, and observed "there is no erythematous or swollen joints but [Boughter] does have subjective stiffness and discomfort."  (*Id*.)  Dr. Waters assessed polyarthralgias, prescribed Meloxicam and Tramadol, and referred Boughter for a rheumatological workup.  (*Id*.)

On March 5, 2013, Boughter returned to Dr. Megerian, after having underwent a repeat MRI of her brain the month before.  (Tr. 387, 474.)  Dr. Megerian found the MRI "shows no evidence of acoustic tumor, but shows that she has a high riding jugular bulb."  (Tr. 387.)  He reassured Boughter and recommended she consider seeing Dr. Wladecki for a hearing aide.  (*Id*.)  Boughter declined, stating she was "doing fine with mild hearing loss" and had had no further vertigo symptoms.  (*Id*.)

In May 2013, physical therapist Jack Kidwell, P.T., performed an evaluation of Boughter's physical functional capacity.  (Tr. 390-430.)  He found Boughter was able to (1) stand for 57 minutes continuously and for a total of 1 hour and 59 minutes during the testing day; (2) walk 792 feet in five minutes; (3) sit for 32 minutes continuously and for a total of 1 hour and

37 minutes during the testing day; (4) lift 10 pounds from floor to waist and 25 pounds from waist to shoulder without pain; (5) carry 20 pounds for 14 feet with decreased stride length; and (6) push/pull a 100 pound sled with an initial force of 28 pounds and a sustained force of 23 pounds for 25 feet without complaining.  (Tr. 391-392.)  Mr. Kidwell also found Boughter had "poor balance reactions," noting her single leg stance on her right leg was 9 seconds and 12 seconds on her left with her eyes open.  (Tr. 392.)  He found Boughter had a limited ability to perform a full squat, crouch, and walk on her heels and toes.  (Tr. 411.)  Boughter was able to climb and descend 30 floors of steps without a break, but antalgic symptoms were noted on the right and left.  (Tr. 424.)  Overall, Mr. Kidwell concluded Boughter "would perform best in an occupation that allows frequent postural changes."  (Tr. 390.)  He found she was a "good candidate for rehabilitation" and "would benefit from a structured therapy environment with the focus on lumbar stabilization, lower extremity range of motion and strengthening, aerobic conditioning and evaluation for an appropriate assistive device to ensure safety with ambulation and to minimize further joint damage."  (*Id.*)

In June 2013, Boughter returned to Dr. Waters, reporting she had "basically not been very functional" and was "feeling achy, tired, and joints have been bothering her."  (Tr. 447.) She stated her "legs are very painful by the end of the day" but she did not want to take pain medication.  (*Id.*)  Dr. Waters nevertheless prescribed Vicodin for "breakthrough pain" and recommended warm water walking, physical therapy and daily exercise.  (*Id.*)

In August 2013, Boughter complained to Dr. Waters that it was "very hard for her to function" due to pain in her back and knees and a "great deal of discomfort in [her] joints pretty consistently."  (Tr. 444.)  She stated epidural injections and physical therapy had not been much

8

help.  (*Id*.)  On examination, Dr. Waters found no edema, swollen or tender joints, or obvious

erythema.  (*Id*.)  She did note pain along the joint line, degenerative changes, and "decreased

light touch bilaterally."  (*Id*.)  Dr. Waters assessed diabetic neuropathy, uncontrolled diabetes,

uncontrolled hypertension, hypercholesterolemia, fatigue, hypothyroidism, osteoarthritis, and

obesity.  (*Id*.)  She noted Boughter "has had multiple medications and procedures and therapies

and they have not been helping."  (*Id*.)  Dr. Waters continued Gabapentin and Tramadol,

increased the Metformin dosage, prescribed Atorvastatin, and recommended further cortisone

injections.  (*Id*.)

Later that month, Boughter underwent a CT scan of her Cervical Spine due to left arm

numbness and tingling.  (Tr. 472.)  The scan showed (1) significant C3-C4, C4-C5, and C5-C6

disc joint space narrowing with marginal anterior perivertebral osteophytes; and (2) lateral

perivertebral osteophytes in the C3-C4, C4-C5, and C5-C6 level on the left side with secondary

intervertebral foramina narrowing.  (*Id*.)

In September 2013, Boughter returned to Dr. Waters with complaints of neck pain

radiating down her left arm, dizziness, and vertigo symptoms.  (Tr. 442.)  On examination, Dr.

Waters found no edema, normal reflexes, full range of motion, and "no strength deficits."  (*Id*.)

She noted subjective tingling down the left arm and "some crepitance in the neck."  (*Id*.)  She

diagnosed cervical radiculopathy, and recommended physical therapy.  (*Id*.)  In addition, Dr.

Waters prescribed antibiotics for Boughter's dizziness and vertigo.  (*Id*.)

On December 5, 2013, Boughter began treatment with pain management specialist David

Ryan, M.D.  (Tr. 480-482.)  She reported pain in her back, feet, and legs for the past fourteen

months, worse with sitting, standing, and "being stable too long."  (Tr. 480.)  On examination,

Dr. Ryan noted minimal tenderness to palpation of the bilateral paravertebral spine; minimal pain with internal and external rotation of the hip; and minimal tenderness to palpation over the greater trochanteric burse bilaterally.  (*Id*.)  He also observed normal gait, 5/5 motor strength, normal reflexes at the knees and ankles, and normal muscle tone.  (Tr. 480-481.)  Dr. Ryan noted 6 out of 18 tender points.  (*Id*.)  He assessed lumbosacral or thoracic radiculopathy, lumbar degenerative disc disease, and spinal stenosis of the lumbar region.  (Tr. 481.)  Boughter stated that her goal was to delay surgery as long as possible.  (*Id*.)  Dr. Ryan prescribed Neurontin, and recommended epidural steroid injections.  (*Id*.)

In February 2014, Boughter returned to Dr. Waters with multiple concerns, including joint pain, back pain, hip pain, and fatigue.  (Tr. 441.)  Dr. Waters noted Boughter "has been getting epidural blocks" and "is due for another series."  (*Id*.)  She noted Boughter may "eventually need surgery" and "is now also starting to feel as if she is depressed from the situation."  (*Id*.)  Examination revealed no edema, normal pulse, and normal neurological signs, but decreased range of hip motion and hip pain.  (*Id*.)  Dr. Waters prescribed Cymbalta and recommended exercise.  (*Id*.)

On March 14, 2014, Dr. Waters wrote a letter regarding Boughter's physical condition as follows:

> Ms. Boughter suffers from degenerative osteoarthritis and chronic pain.  She also has a diagnosis of obesity and diabetes mellitus and these conditions are difficult to manage due to her chronic pain.  She has chronic low back pain as well due to severe sciatica.  This makes sitting for extended periods of time difficult as well as prolonged standing.  This severely limits her ability to work.

(Tr. 484.)

On May 5, 2014, Boughter reported swelling in her legs, shortness of breath on exertion,

10

chronic joint pain, and worsening lower back pain radiating into her legs.  (Tr. 437.)  She stated

"she feels as if she is overall getting weaker." (*Id*.)  Dr. Waters noted 1+ pitting edema

bilaterally, musculoskeletal degenerative changes in her knees, and lumbar radiculopathy.  (Tr.

439.) Neurologic examination also revealed "DTRs are equal bilaterally strength symmetrical in

the upper extremities slightly lessened in the lower, gait is straight and steady." (*Id*.)  Dr. Waters

assessed edema and shortness of breath on exertion, and prescribed Lasix.  (*Id*.)

Boughter returned to Dr. Ryan on July 31, 2014.  (Tr. 491-493.)  She complained of pain

"radiating from her lower back down the lateral aspect of her leg to the top of her foot on the

right," as well as "burning of both feet." (Tr. 491.)  Boughter stated the pain was constant and

rated it an 8 on a scale of 10.  (*Id*.)  She stated it was exacerbated by standing and walking, and

relieved by sitting.  (*Id*.)  Dr. Ryan noted as follows:

> She has had epidurals with Dr. Sfier [sic] before that had improved her pain for
> a matter of a few weeks and then we did these epidurals back in February and
> March.  She is fairly impressed with the amount of relief she had from this last
> set of transforaminal epidurals which specifically targeted the suspected source
> of her pain.  However, she has been very disappointed by the fact that it only
> lasted about five weeks.  She definitely would have a better and more
> meaningful life if that would last all the time.

(*Id*.)  Examination revealed allodynia to light touch of the dorsal surface of the skin of her feet,

with the right more constant than the left.  (Tr. 492.) Dr. Ryan also noted a positive slump test on

the right.  (*Id*.)

Dr. Ryan interpreted imaging to show the following: (1) disc herniations at each lumbar

level with canal stenosis extending the length of the lumbar spine, with the most severe canal

compromise at the L5 level; (2) focal signal abnormality in the posterior annulus at the L1 level

suspicious for partial-thickness tear; and (3) facet arthropathy at each lumbar level, with varying

11

degrees of neuroforaminal compromise in associated nerve impingement at the lower 3 lumbar levels.  (Tr. 492.)  He diagnosed lumbar stenosis, lumbosacral radiculopathy, and peripheral neuropathy.  (*Id*.)  Dr. Ryan noted Boughter had a strongly positive diagnostic response to L5/S1 and S1 transforaminal epidural steroid injection.  (*Id*.)  He confirmed she had peripheral neuropathy, which he believed would continue even if she underwent surgery, and that she had "severe stenosis" at L5 which he described as a "significant contributor to her misery."  (*Id*.)  Dr. Ryan recommended Boughter undergo surgical consultation, obtain an updated MRI, and consider a spinal cord stimulator.  (Tr. 492-493.)

On August 18, 2014, Dr. Waters submitted a Disability Impairment Questionnaire regarding Boughter's physical impairments.  (Tr. 495-499.)  She listed Boughter's primary symptoms as chronic back, knee, and foot pain, and described the nature of the pain as moderate. (Tr. 496.)  She noted Boughter was not a malingerer.  (Tr. 495.)  Dr. Waters concluded Boughter could (1) sit for a total of 6 hours in an 8 hour workday with breaks, and (2) stand/walk for a total of 1 to 2 hours in an 8 hour workday with breaks.  (Tr. 497.)  She found it was medically necessary for Boughter to elevate both legs to waist level while sitting, "as needed for swelling." (*Id*.)  She also found Boughter could frequently lift and carry up to 10 pounds, and occasionally lift and carry over 50 pounds.  (*Id*.)  Dr. Waters found Boughter had no significant limitations in reaching, handling or fingering.  (Tr. 498.)  She also stated that Boughter's symptoms would not likely increase if she were placed in a competitive work environment, and her experience of pain, fatigue or other symptoms would only rarely be severe enough to interfere with attention and concentration.  (*Id*.)  Dr. Waters opined Boughter would likely be absent from work less than once per month as a result of her impairments or treatment.  (Tr. 499.)  She further found

12

Boughter would need to take unscheduled breaks to rest at unpredictable intervals during an eight hour workday.  (Tr. 498.)  She stated the frequency of these breaks would be variable and estimated they would last less than 15 minutes.  (*Id*.)  Finally, Dr. Waters indicated Boughter's symptoms and related limitations applied as of "2011-2012."  (*Id*.)

On August 27, 2014, Boughter presented to Steven Fulop, M.D., for a surgical consultation.  (Tr. 501-505.)  Dr. Fulop reviewed an MRI of Boughter's lumbar spine, noting it revealed recurrent disc herniation at L5-S1 causing significant spinal stenosis, collapse of the disc space, and severe bony foraminal stenosis compressing the bilateral exiting L5 nerve roots and the traversing S1 nerve roots.  (Tr. 501.)  Examination revealed full passive range of motion and no significant edema in Boughter's extremities.  (Tr. 504.)  Dr. Fulop noted moderate lumbosacral paraspinous tenderness radiating to the left buttock.  (*Id*.)  He also observed diminished sensation in the bilateral lower extremities, antalgic gait, and absent reflexes in the patellar and Achilles bilaterally.  (*Id*.)  Dr. Fulop assessed foraminal stenosis of the lumbar region, noting "mechanical back pain with neurogenic claudication at L5-S1 secondary to lateral gutter and foraminal stenosis."  (Tr. 504-505.)  He recommended transforaminal lumbar interbody fusion at L5-S1.  (Tr. 505.)

Richard Rhiew, M.D., subsequently reviewed results of an MRI of Boughter's lumbar spine.[2]  (Tr. 509-514.)  This MRI showed (1) L5/S1 spondylolisthesis, (2) straightening of the lumbar lordosis consistent with muscular spasm or strain, (3) disc degeneration at each lumbar level, (4) canal stenosis extending the length of the lumbar spine, (5) persistent and essentially unchanged broad-based disc herniation at the L1 level, and (6) persistent and essentially

---

[2]  The date this MRI was performed is unclear from the record.

unchanged central and right parasagittal disc herniation at the L3 level.  (Tr. 513.)  Dr. Rhiew

recommended Boughter follow up with Dr. Fulop regarding surgery, as well as pain

management, physical therapy, and occupational therapy.  (Tr. 514.)

**C.      State Agency Reports**

On December 6, 2012, Boughter underwent a consultative examination with Hasan

Assaf, M.D.  (Tr. 348-357.)  Boughter reported back pain radiating to the left leg that was sharp,

caused her to wake up at night, and was aggravated by bending, pulling, and weight lifting.  (Tr.

348.)  Boughter also complained of right foot pain, which she described as sharp, intermittent,

and worse with walking and bending.  (*Id*.)  She reported knee pain that was "dull, constant, and

aggravated by walking, bending, and lifting weights."  (*Id*.)  Finally, she complained of "ten

years of left ankle pain."  (*Id*.)  She rated this pain an 8 on a scale of 10, stating it prevented her

from sleeping; was aggravated by increased bending, lifting, walking, pulling, and pushing; and

was relieved by pain medication and physiotherapy.  (*Id*.)  Boughter reported to Dr. Assaf that

she cooked five times a week, showered daily, and bathed and dressed herself daily.  (Tr. 349.)

She stated her family was responsible for cleaning, laundry, shopping, and child care.  (*Id*.)

On examination, Dr. Assaf found normal strength in Boughter's lower extremities, no

muscle spasm, and no muscle atrophy.  (Tr. 354-355.)  Her range of motion was normal

throughout her body.  (Tr. 356.)  Dr. Assaf also observed a normal gait, the ability to walk on

heels and toes without difficulty, ability to partially squat (limited to 30 degrees flexion of the

knees), negative straight leg raising bilaterally, and a normal stance.  (Tr. 350.)  He stated

Boughter used no assistive devices, needed no help changing for the exam or getting on or off

the exam table, and was able to rise from her chair without difficulty.  (*Id*.)  Dr. Assaf also noted

14

Boughter's joints were stable and nontender with no redness, heat, swelling or effusion. (Tr. 351.) Her reflexes were equal in her arms and legs, but absent in her ankles. (*Id*.) Dr. Assaf observed a loss of light sensation in both toes, and mild crepitation in both knees. (*Id*.) He noted no edema in Boughter's extremities. (*Id*.)

Dr. Assaf diagnosed (1) lumbar disc disease, (2) peripheral neuropathy/sensory, (3) degenerative joint disease both knees and left ankle, (4) acoustic neuroma of right ear with vertigo, (5) hypothyroidism, on treatment, (6) high blood pressure, on treatment, and (7) morbid obesity. (Tr. 351.) He described her prognosis as "stable." (*Id*.) In terms of Boughter's physical functional limitations, Dr. Assaf concluded as follows:

> There are mild to moderate limitations on pushing, pulling, lifting, and climbing. Claimant should avoid heights and uneven surfaces secondary to vertigo. There are no limitations on hearing conversational speech.

(*Id*.)

On December 13, 2012, state agency physician Gerald Klyop, M.D., reviewed Boughter's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 96-97.) He found Boughter could lift and carry 10 pounds frequently and 20 pounds occasionally; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8 hour workday; and sit (with normal breaks) for a total of about 6 hours in an 8 hour workday. (*Id*.) He further found she had unlimited push/pull capacity. (*Id*.) In terms of her postural limitations, Dr. Klyop opined Boughter could frequently stoop; occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; and never climb ladders, ropes, and scaffolds. (*Id*.) Dr. Klyop found Boughter had no manipulative or communicative limitations; however, she should avoid all exposure to unprotected heights. (*Id*.)

15

On April 17, 2013, state agency physician Frank Stroebel, M.D., reviewed Boughter's medical records and completed a Physical RFC Assessment.  (Tr. 108-110.)  He reached the same conclusions as Dr. Klyop, with the exception that he found Bougher could frequently (as opposed to occasionally) balance.  (*Id*.)

**D.    Hearing Testimony**

During the August 12, 2014 hearing, Boughter testified to the following:

- She lives with her husband and two daughters.  (Tr. 51-52.)

- From 2003 to 2010, she worked in bartending and sales for a local winery.  She was on her feet most of the time, but was not required to lift or carry anything heavier than a wine bottle.  She was gradually weaning herself off working when "everyone got laid off."  (Tr. 57-59.)

- She reported some self-employment income in 2011 from freelance bartending jobs once or twice per month.  She last worked as a bartender in December 2011.  (Tr. 58.)

- Her biggest problem that keeps her from working is her lower back pain.  (Tr. 60.)  She experiences lower back pain "all the time."  (Tr. 64.)  Her pain is exacerbated by standing or sitting for more than ten minutes.  (*Id*.)  She also suffers neuropathy in her feet and right leg.  (Tr. 64-65.)  She has shooting pains in her foot and no feeling in her toes, making balancing "very difficult."  (*Id*.)  She experiences neuropathic pain "all the time."  (Tr. 66.)  She also experiences knee pain, although her "knees are the least of [her] problems."  (Tr. 63, 66.)

- Other health problems include diabetes and vertigo.  (Tr. 67-68.)  Her vertigo is the result of a viral infection in her right ear that caused her to lose 80% of her hearing.  She cannot afford a hearing aide and, instead, takes pills "when she has an episode."  (Tr. 67.)  She has such an episode once every couple months.  (Tr. 68.)

- She has had injections for her back pain but without "much success."  (Tr. 61.)  She had an appointment a few weeks after the hearing to see a neurosurgeon about the possibility of back surgery.  (*Id*.)  She will need knee replacements at some point, but must address her back problems first.  (Tr. 62-63.)  Her doctors are also considering spinal stimulators.  (Tr. 62.)  She uses a cane whenever she leaves the house. (Tr. 65.)

16

- She takes numerous medications for her various conditions, including Neurontin, prescription Motrin, Synthroid, Metformin, Lasix, and high blood pressure medication.  (Tr. 68.) Side effects include dry mouth and hand tremors.  (Tr. 68-69.)

- She can walk twenty-five (25) feet before having to stop and take a break.  (Tr. 69.)  She estimated she could spend a total of thirty (30) minutes standing or walking during an eight hour workday.  (Tr. 70.)  She can only drive for about twelve (12) minutes because she cannot sit for any longer than that.  (Tr. 71.)  She cannot lift anything and keep her balance.  (Tr. 54.)  When she takes a gallon of milk out of the refrigerator, she has to hold onto the  stove as leverage because lifting hurts her back and throws off her balance.  (Tr. 69.)

- She does not sleep well due to her back, leg, and foot pain.  (Tr. 71.)  She does not have much energy when she wakes up in the morning, and takes an hour long nap every afternoon.  (Tr. 71-72.)  She spends most of her days (at least several times per week) managing her disability.  (Tr. 54.)

- She can bathe and dress herself.  (Tr. 72.)  She can get in and out of a bathtub, using a bar to lean on.  (Tr. 72-73.)  She drives, but only for short distances.  (Tr. 55.)  She dusts, but her daughters do the vacuuming and laundry.  (Tr. 54-55.)  She will go to Drug Mart but does not do grocery shopping.  (Tr. 55.)  The last time she went to the grocery store she had to use a motorized cart.  (*Id*.)

- She enjoys reading, but has to get up every ten to fifteen minutes to change position.  (Tr. 56, 73.)  She does not watch "a whole lot" of television.  She does not belong to any clubs, organizations, or church groups.  (Tr. 56.)  She goes on the computer a couple times each day to check the news, etc.  (Tr. 56-57.) She emails a little bit, but it is hard for her to do because the Neurontin "makes [her] fingers jump."  (Tr. 57.)

- She cannot afford physical therapy, but she does movement exercises at the local pool.  (Tr. 54, 74.)

The VE testified Boughter had past work as a bartender (light, semi-skilled, performed as medium) and in sales (light, skilled, performed as medium).  (Tr.  76-77.)  He testified the sales job had transferable skills, including "verbal skills, people skills, ability to persuade, and organizational skills."  (Tr. 77-78.)  The ALJ then posed the following hypothetical question:

I'm going to give you a couple of different hypotheticals. The first one is first off, I'd like you to consider a person with the same age, education, and past work

17

as the claimant who is able to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; is able to stand and walk six hours of an eight-hour workday; is able to sit for six hours of an eight-hour workday; would have unlimited push and pull other than shown for lift and/or carry; could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally stoop, balance, kneel, crouch, and crawl; and must avoid all exposure to hazards, and by that I mean no exposure to unprotected heights or uneven surfaces.  Given such a hypothetical individual, first off, would this hypothetical individual be able to perform the claimant's past work as those occupations are either generally or actually performed?

(Tr. 78.)

The VE testified the hypothetical individual would be able to perform Boughter's past bartender and sales work as identified in the Dictionary of Occupational Titles ("DOT") (i.e., as light) however not as actually performed (i.e., as medium).  (Tr. 78.)  The ALJ then added the additional limitation that the individual "would need to be able to alternate positions every 30 minutes but could keep working during those position changes."  (Tr. 79.)  The VE testified the hypothetical individual would be able to perform Boughter's past bartender and sales work as identified in the DOT.  (*Id*.)  The ALJ then added a further limitation that "this hypothetical individual might be off task approximately 20 percent of the time due to issues with chronic pain."  (*Id*.)  The VE testified that, with this limitation, there would be "no jobs" for such a hypothetical individual.  (Tr. 79-80.)

The ALJ then asked another hypothetical as follows:

I'm going to give you a different hypothetical now.  My next one is I'd like you to consider a person with the same age, education, and past work as the claimant who is able to occasionally lift and carry 10 pounds and frequently lift and carry five pounds; is able to stand and walk two hours of an eight-hour workday; is able to sit for six hours of an eight-hour workday; would have unlimited push and pull other than shown for lift and/or carry; could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally stoop, balance, kneel, crouch, and crawl; and must avoid all exposures to hazards, and by that I mean no exposure to unprotected heights or uneven surfaces.

18

(Tr. 80.)

The VE testified the hypothetical individual would not be able to perform Boughter's past work, either as generally or actually performed.  (Tr. 80.)  The VE, however, testified the hypothetical individual could perform such representative jobs as receptionist appointment clerk (sedentary, semi-skilled, SVP 3); reference information aide (sedentary, semi-skilled, SVP 3); and telemarketer (sedentary, semi-skilled, SVP 3).  (Tr. 81-82.)

The ALJ then added an additional limitation to the above hypothetical that the individual "would need to be able to shift positions every 30 minutes but could keep working during those positions shifts."  (Tr. 82.)  The VE testified such an individual could perform the previously identified jobs of receptionist appointment clerk, reference information aide, and telemarketer.  (*Id.*)  The ALJ then added a limitation that the individual "might be off task approximately 20 percent of the time due to issues with chronic pain."  (*Id.*)  The VE testified there would be no jobs for such an individual.  (*Id.*)

Boughter's attorney then asked the VE a series of hypothetical questions as follows:

Q:      I believe the judge had asked you as far as her first series of hypotheticals, and I noticed– noted it's actually two series, one at the light level and one at the sedentary level.  And the series of first questions the judge asked you at the light level – if someone had to alternate positions every 30 minutes, and I believe you gave her an answer.  And if I reduce the amount of time required to alternate positions to every 10 minutes such that if a person was standing, they would need to sit down and rest every 10 minutes or if they were sitting, they would need to stand up, based on that limitation, would they be able to do their past relevant work?

A:      Okay.  Now you added a variable by saying sit down and rest.

Q:      Okay, and that's fair.  Use my hypothetical if you would.

A:      Okay, so they would sit down to rest.  The bartender job would be

19

> challenged by that hypothetical because a bartender has to serve the
> people at the bar and there might be busy times.  The sales job has a
> little more flexibility, so I would say the bartender job would not be
> feasible with that hypothetical.

(Tr. 85-86.)  Boughter's counsel then added the limitation that the hypothetical individual would

be limited to simple, routine tasks due to the experience of pain, fatigue or other symptoms.  (Tr.

87.)  The VE testified such an individual would not be able to perform any of Boughter's past

relevant work.  (*Id*.)  Finally, Boughter's counsel asked generally "if someone would be absent

from work two or more days per month due to a combination of their impairments, again

whether it's fatigue, pain, or medical treatment, seeing doctors, if they had that time of

limitation, would there be any jobs that they could do?"  (*Id*.)  The VE testified there would be

no jobs because "based on [his] experience, employers will not tolerate any more than one

unscheduled absence a month."  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

that can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when

she became disabled; and (3) she filed while she was disabled or within twelve months of the

date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way

of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v.*

20

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Boughter was insured on her alleged disability onset date, September 1, 2010, and remained insured through December 31, 2015, her DLI.  (Tr. 23.)  Therefore, in order to be entitled to POD and DIB, Boughter must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

21

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.    The claimant has not engaged in substantial gainful activity since September 1, 2010, the alleged onset date (20 CFR 404.1571 et seq.)

3.    The claimant has the following severe impairments: osteoarthritis/degenerative joint disease (knees and left ankle), degenerative disc disease (cervical and lumbar), obesity, diabetes mellitus, peripheral neuropathy, and history of acoustic neuroma of the right ear with vetigo (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of light work with the following additional limitations (see generally 20 CFR 404.1567(b)).  She is able to lift and carry 20 pounds occasionally and 10 pounds frequently.  She is able to stand and walk 6 hours of an 8-hour workday.  She is able to sit for 6 hours of an 8-hour workday.  She has unlimited push and pull other than shown for lift and/or carry.  She can climb ramps and stairs occasionally.  She can never climb ladders, ropes, and scaffolds.  She can occasionally stoop, kneel, crouch, and crawl.  She must avoid all exposure to hazards, such as no exposure to unprotected heights or uneven surfaces.

6.    The claimant is capable of performing past relevant work as a bartender/sales as generally performed in the national economy and as classified in the Dictionary of Occupational Titles.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2010, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 23-35.)

22

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice"

23

within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

***Weighing of Opinion Evidence and RFC Determination***

24

Boughter raises a number of arguments in her first assignment of error.  She first

maintains the ALJ violated the treating physician rule by failing to provide "good reasons" for

rejecting Dr. Waters' March and August 2014 opinions.  Boughter maintains the ALJ incorrectly

rejected these opinions on the grounds her pain symptoms were "ameliorated by conservative

pain management," arguing this finding is based on a misinterpretation of the evidence.  In this

regard, Boughter emphasizes the ALJ failed entirely to mention Dr. Fulop's August 2014

examination findings and recommendation that she undergo lumbar surgery.  She also asserts the

ALJ improperly failed to acknowledge that Dr. Waters' opinion is consistent with both Mr.

Kidwell's Functional Capacity Evaluation, Dr. Fulop's treatment report, and the objective

medical evidence, including the MRI evidence regarding her lumbar spine.

Boughter also argues the ALJ failed to acknowledge the length of Dr. Waters' treatment

relationship and frequency of examination and, further, failed to "offer any specific findings

from Dr. Ryan's treatment notes to legitimately discount [Dr. Waters'] opinion." (Doc. No. 13 at

20.)  She asserts the ALJ erred in relying, instead, on the opinions of consultative examiner Dr.

Assaf and state agency physicians Drs. Klyop and Stroebel.  She argues these opinions were

rendered nearly two years prior to the ALJ decision and were "made without a review of the

relevant MRI evidence and without a review of the following two years evidence of severe and

chronic pain."  (*Id*. at 21.)  In light of all of the above, Boughter asserts the RFC is not supported

by substantial evidence as it is "not consistent with any of the assessments of capacity contained

in the file." (*Id*. at 22.)

The Commissioner argues the RFC is supported by substantial evidence in the record,

emphasizing a series of normal physical examination findings, Boughter's conservative

25

treatment history, and the fact that she worked following her onset date.  The Commissioner

further claims the ALJ properly accorded less weight to Dr. Waters' opinion.  She notes that the

ALJ, in fact, agreed with a number of Dr. Waters' specific findings, including her opinions

regarding Boughter's sitting, lifting, carrying, and manipulative restrictions.  The Commissioner

asserts the "only real disagreement" between the ALJ and Dr. Waters was with regard to Dr.

Waters' opinions that Boughter could only stand/walk for 1 to 2 hours, and needed to elevate her

legs and take unscheduled breaks.  The Commissioner argues the ALJ provided good reasons for

rejecting these particular limitations, including the "ameliorative effect of conservative

treatment" on Boughter's pain symptoms, the "longitudinal history of objective evidence,"

Boughter's activities of daily living, and the fact that she worked after her onset date.  Finally,

the Commissioner maintains the ALJ properly accorded significant weight to the opinions of

Drs. Assaf, Klyop, and Stroebel because they were "consistent with the medical evidence as a

whole."  (Doc. No. 15 at 19, 20-21.)

   As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain

standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710

F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical

opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source

of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a

general matter, an opinion from a medical source who has examined a claimant is given more

weight than that from a source who has not performed an examination (a 'nonexamining

source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly

treats the claimant (a 'treating source') is afforded more weight than that from a source who has

examined the claimant but does not have an ongoing treatment relationship (a 'nontreating

source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.*  In other words, "[t]he regulations provide

progressively more rigorous tests for weighing opinions as the ties between the source of the

opinion and the individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2

(Soc. Sec. Admin. July 2, 1996).

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*,

2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a

finding that a treating source medical opinion . . . is inconsistent with the other substantial

evidence in the case record means only that the opinion is not entitled to 'controlling weight,'

not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir.

2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at *

4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally

entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical

opinions are still entitled to deference and must be weighed using all of the factors provided in

20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[3]

---

[3] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a
treating physician's opinion, the Commissioner should consider the length of the
relationship and frequency of examination, the nature and extent of the treatment
relationship, how well-supported the opinion is by medical signs and laboratory findings,
its consistency with the record as a whole, the treating source's specialization, the
source's familiarity with the Social Security program and understanding of its evidentiary
requirements, and the extent to which the source is familiar with other information in the
case record relevant to the decision.

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.[4]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d

---

[4]  "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id.* § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, the ALJ determined Boughter suffered from the severe impairments of osteoarthritis/degenerative joint disease of the knees and left ankle, degenerative disc disease of the cervical and lumbar spines, obesity, diabetes mellitus, peripheral neuropathy, and history of acoustic neuroma of the right ear. (Tr. 26.) After determining Boughter's impairments did not meet or medically equal the requirements of a Listing, the ALJ found, at step four, that Boughter's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, her statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible" for the following reasons. First, the ALJ concluded Boughter "has had an ameliorative response to conservative treatment modalities,

including Neurontin, Naprosyn, and very limited use of Vicodin and various courses of corticosteroid injections and special OrthoVisc injections." (Tr. 30.)  In support, the ALJ cited several treatment notes indicating Boughter was "doing well" with Naprosyn and Neurontin. (*Id*.)

Second, the ALJ found Boughter has a "longitudinal history of objective musculoskeletal and neurological findings [that] do not support physical limitations greater than those described in this finding."  (*Id*.)  The ALJ then discussed, at some length, physical examination findings contained in various treatment notes from Drs. Panigutti, Waters, Sfeir, and Ryan, including findings of normal gait, posture, reflexes, and motor strength, as well as minimal tenderness to palpation in the spine and trochanteric bursa.  (*Id*.)  The ALJ also discussed the results of Dr. Assaf's consultative examination. (*Id*.)

Third, the ALJ noted Boughter underwent a functional capacity evaluation with Mr. Kidwell, who determined she was a good candidate for rehabilitation.  (Tr. 31.)  The ALJ remarked, however, that "the evidence indicates the claimant has not fully complied with . . . medical advice" to exercise as much as possible.  (*Id*.)  The ALJ acknowledged Mr. Kidwell's opinion that Boughter would "perform best in an occupation that allows frequent postural changes;" however, the ALJ noted VE testimony that a hypothetical individual similar to Boughter would be able to perform Boughter's past work as bartender/salesperson even with the limitation that she had to alternate positions every thirty minutes without disruption in her work activity.  (*Id*.)

Fourth, the ALJ noted that "despite the claimant's chronic back and joint pain, she appeared to give Dr. Ryan the impression that she was taking care of her husband, who had an

acute bout of diverticulitis that required a reversal of his colostomy around July 31, 2014." (Tr. 31.) She also noted Boughter's representation to Dr. Assaf that she cooked for her family and showered/bathed/dressed daily. (*Id.*) Finally, the ALJ found Boughter "not entirely credible" in light of the fact that she engaged in post-onset work activity as a bartender/sales person in 2011, "from which she earned $6,923." (Tr. 32.)

After discussing the medical evidence regarding Boughter's diabetes and vertigo, the ALJ evaluated the opinion evidence as follows:

> The undersigned gives significant weight to Dr. Assaf's consultative examining physical assessment because his observations are consistent with the light residual functional capacity assessment described in this finding (Exh. 10F).

> The undersigned gives less weight to Dr. Waters' treating source statement from March 14, 2014 because, although the claimant has experienced pain, the pain symptoms have responded amelioratively to conservative pain management, as evidenced by Dr. Ryan's treatment notes and the longitudinal history of objective evidence described in this finding (Exh. 16F). Similarly, the undersigned gives less weight to Dr. Waters' treating source statement from August 18, 2014 for the same reasons (Exh. 19F).

> The undersigned gives some weight to a functional capacity evaluation from physical therapist Mr. Kidwell (Exhs. 12F, 13F). He observed that the claimant was able to stand for an hour but the longest continuous span that she stood was 69 minutes during testing. (Exh. 12F). He observed that she was able to sit for a total of one hour and 37 minutes. (Exh. 12F). He also observed that the claimant required multiple position changes that included getting out of her chair for brief periods during the sitting tasks (Exh. 12F). She was able to carry 20 pounds for 14 feet with decreased stride length. Her gait improved, however, when she carried 15 pounds (Exh. 12F). She was able to perform testing for physical demands consistent with sedentary and light exertional weight restrictions (i.e., carrying up to 10 pounds on an occasional basis, pushing up to 20 pounds on an occasional basis, and pulling up to 10 pounds on an occasional basis) (Exh. 12F).

> * * *

> The undersigned gives significant weight to the State Agency medical consultants' physical assessments in the record because their opinions establish

31

that the claimant has retained the capacity to perform substantial gainful activity within the scope of a reduced range of light work (to the extent adopted in this finding) and to the extent that their opinions are consistent with the record as a whole, including evidence received at the hearing level (Exhs. 1A, 3A).

(Tr. 33.)  The ALJ formulated the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of light work with the following additional limitations (*see generally* 20 CFR 404.1567(b)).  She is able to lift and carry 20 pounds occasionally and 10 pounds frequently.  She is able to stand and walk 6 hours of an 8-hour workday. She is able to sit for 6 hours of an 8-hour workday.  She has unlimited push and pull other than shown for lift and/or carry.  She can climb ramps and stairs occasionally.  She can never climb ladders, ropes, and scaffolds.  She can occasionally stoop, kneel, crouch and crawl.  She must avoid all exposure to hazards, such as no exposure to unprotected heights or uneven surfaces.

(Tr. 29.)  Based on the VE testimony, the ALJ determined Boughter could perform her past work as a bartender/salesperson as generally performed in the national economy and as classified in the Dictionary of Occupational Titles; i.e., at the light level.  (Tr. 33.)

It is undisputed that Dr. Waters was Boughter's treating physician at the time she rendered her March and August 2014 opinions.  It is also undisputed that the RFC is consistent with (or, in some instances, more restrictive) than Dr. Waters' opinions in several respects. Specifically, the RFC limits Boughter to lifting and carrying 20 pounds occasionally and 10 pounds frequently, while Dr. Waters opined Boughter could lift and carry over 50 pounds occasionally and 10 pounds frequently.  Additionally, the RFC is consistent with Dr. Waters' conclusion that Boughter has no limitations in reaching, handling or fingering.  There is also no inconsistency with regard to the RFC's postural limitations, as Dr. Waters did not indicate (in either her March or August 2014 opinion) that Boughter had any limitations in pushing/pulling, climbing ramps and stairs, climbing ladders/ropes/scaffolds, stooping, kneeling, crouching, or

32

crawling.

The ALJ, however, rejected several other key opinions expressed in Dr. Waters' August 2014 Physical RFC Assessment. As noted *supra*, Dr. Waters opined Boughter could stand and/or walk for 1 to 2 hours in an 8-hour workday "with breaks," and could sit for 6 hours in an 8-hour workday "with breaks." (Tr. 497.) She also determined Boughter would "need to take unscheduled breaks to rest at unpredictable intervals during an 8-hour workday." (Tr. 498.) Dr. Waters stated these breaks would occur on a variable basis and, during each break, Boughter would have to rest for up to 15 minutes before returning to work. (*Id.*) Finally, Dr. Waters opined it was medically necessary for Boughter to elevate both of her legs to waist level while sitting, on an as-needed basis. (Tr. 497.) The ALJ clearly rejected Dr. Waters' opinions regarding Boughter's stand/walk capacity, as well as her need to take unscheduled rest breaks and elevate her legs.

The Court finds the ALJ failed to provide "good reasons" for rejecting these opinions. As noted above, the ALJ's stated reason for providing "less weight" to Dr. Waters' opinions was that Boughter's "pain symptoms have responded amelioratively to conservative pain management, as evidenced by Dr. Ryan's treatment notes and the longitudinal history of objective evidence described in this finding." (Tr. 33.) Substantial evidence does not support the ALJ's conclusion that Boughter's pain responded amelioratively to conservative treatment. Dr. Ryan's treatment notes (dated December 6, 2013 and July 31, 2014) do reflect that Boughter had a positive response to epidural steroid injections. (Tr. 480, 491-492.) However, those same notes indicate Boughter's relief was short-lived before "worsening back to base line." (Tr. 491.) Specifically, in July 2014, Boughter stated she was "fairly impressed with the amount of relief"

33

she experienced from transforaminal epidurals but was "very disappointed that it only lasted

about five weeks," noting "she would have a better and more meaningful life if it would last all

the time."  (*Id*.)  Boughter expressed her desire to "delay surgery as long as possible" by

exhausting conservative treatment measures.  (Tr. 480-481.)  However, by mid-2014, her back

pain was constant and severe, with Boughter rating it an 8 on a scale of 10.  (Tr. 491.)  An MRI

reviewed by Dr. Ryan showed "disc herniations at each lumbar level with canal stenosis

extending the length of the lumbar spine," as well as neuroforaminal compromise and nerve

impingement at the lower three lumbar levels.  (Tr. 492.)  Dr. Ryan acknowledged Boughter's

positive response to injections but nonetheless concluded her "severe stenosis at L5 was . . . a

significant contributor to her misery."  (*Id*.)  He determined "the fact that she was significantly

improved and really enjoyed the amount of pain relief that she had [from] epidural [injections]

suggests to me that she should be seen [by] surgeons at this point."  (Tr. 492-493.)  Dr. Ryan

also noted that, even with surgery, Boughter would likely have "burning pain in her feet" due to

her neuropathy and would possibly need a spinal cord stimulator.  (Tr. 493.)

The following month, Boughter presented to Dr. Fulop for surgical evaluation.  (Tr.

501-505.)  In his treatment note (which the ALJ does not discuss at any point in the decision),

Dr. Fulop states as follows:

> Patient had long-term relief from the symptoms until several years ago when
> she began to have aggressive worsening mechanical back pain radiating to the
> bilateral buttocks down the posterolateral aspect of the thighs into the calves
> and feet.  The patient has well-controlled diabetes with a moderate amount of
> burning neuropathy type pain in her feet. . . . An MRI of the lumbar spine was
> performed revealing recurrent disc herniation at L5-S1 causing significant
> spinal stenosis.  There is collapse of the disc space with endplate edema and
> severe bony foraminal stenosis compressing the bilateral exiting L5 nerve
> roots and the traversing S1 nerve roots.  The patient has undergone physical
> therapy, chiropractic manipulation, and several recent epidural steroid

34

injections after seeing 2 different interventional pain management physicians.
She now follows up in clinic to discuss surgical options.

(Tr. 501.)  As noted *supra*, on examination, Dr. Fulop found moderate lumbosacral paraspinous

tenderness radiating to the left buttock, antalgic gait, diminished sensation in the bilateral lower

extremities, and absent reflexes at the patellar and Achilles bilaterally.  (Tr. 504.)  He expressed

his impressions and recommendations as follows:

> Mechanical back pain with neurogenic claudication at L5-S1 secondary to
> lateral gutter and foraminal stenosis. . . . I am recommending transforaminal
> lumbar interbody fusion at L5-S1.  Spinal stenosis extends far into the lateral
> gutter and foramen with vertical collapse of the foraminal height.  The amount
> of bony decompression required almost certainly destabilizes the spine at this
> level.  Disc space extension will help to increase foraminal height and relieve
> nerve root compression from axial loading forces.  Finally fixation is
> necessary to promote fusion.  I discussed the risks and benefits of the
> procedure including bleeding, infection, nerve root injury, and spinal fluid
> leak.  The patient understands and wished to proceed.

(Tr. 505.)  Thereafter, Dr. Rhiew reviewed the results of an MRI of Boughter's lumbar spine,

which showed (1) L5/S1 spondylolisthesis, (2) straightening of the lumbar lordosis consistent

with muscular spasm or strain, (3) disc degeneration at each lumbar level, (4) canal stenosis

extending the length of the lumbar spine, (5) persistent and essentially unchanged broad-based

disc herniation at the L1 level, and (6) persistent and essentially unchanged central and right

parasagittal disc herniation at the L3 level.  (Tr. 513.)

Although Dr. Fulop's and Dr. Rhiew's treatment notes were part of the record before

the ALJ,[5] the ALJ did not acknowledge or address them at any point in the decision.  Nor does

---

[5] At the hearing, the ALJ announced she would leave the record open for two weeks to
allow Boughter to submit additional medical evidence. (Tr.  47, 87-88.)  In the decision,
the ALJ states that "additional medical evidence was submitted into the record, which the
undersigned has marked as Exhibits 18, 19, and 20."  (Tr. 23.) Dr. Fulop's and Dr.
Rhiew's treatment notes are located at Exhibit 20F and, thus, were part of the record

the ALJ address the statements in Dr. Ryan's treatment records indicating steroid injections failed to provide long term relief for Boughter, or his recommendation that surgical consultation was necessary.  Read as a whole, and in the context of Boughter's progressively worsening back pain, the Court finds the treatment records discussed above directly undermine the ALJ's finding that Boughter responded amelioratively to conservative pain management.

The Court further finds the ALJ failed to provide a sufficiently specific explanation for her second reason for according "less weight" to Dr. Waters' opinions; i.e., that "the longitudinal history of objective evidence" supports the rejection of Dr. Waters' opinions regarding Boughter's stand/walk capacity, and need to elevate her legs and take unscheduled breaks.  The record contains numerous abnormal physical examination findings, including positive straight leg raise, decreased neurosensory in the bilateral lower extremities, 1+ pitting edema bilaterally, positive slump test, antalgic gait, absent reflexes, and diminished sensation.  (Tr. 345, 492, 439, 504.)  Moreover, objective tests consistently revealed severe findings.  For example, x-rays of Boughter's knees in June 2011 showed "bone on bone wear."  (Tr. 339-340.)  An August 2013 CT scan of Boughter's cervical spine revealed "significant" C3-C4, C4-C5, and C5-C6 disc joint space narrowing, as well as osteophytes in the C3-C4, C4-C5, and C5-C6 level on the left with secondary foramina narrowing.  (Tr. 472.)  An MRI of Boughter's lumbar spine reviewed by Dr. Ryan revealed (1) disc herniations at each lumbar level with canal stenosis extending the length of the lumbar spine, with the most severe canal compromise at the L5 level; (2) focal signal abnormality in the posterior annulus at the L1 level suspicious for partial-thickness tear; and (3) facet arthropathy at each lumbar level, with varying degrees of neuroforaminal compromise in

---

before the ALJ.  The Commissioner does not dispute this fact.  (Doc. No. 15 at 22.)

associated nerve impingement at the lower 3 lumbar levels.  (Tr. 492.)  Dr. Fulop characterized MRI results of Boughter's lumbar spine as showing recurrent disc herniation at L5-S1 causing significant spinal stenosis, collapse of the disc space, and severe bony foraminal stenosis compressing the bilateral exiting L5 nerve roots and the traversing S1 nerve roots.  (Tr. 501.)  Finally, the MRI results contained in Dr. Rhiew's treatment note show (1) L5/S1 spondylolisthesis, (2) straightening of the lumbar lordosis consistent with muscular spasm or strain, (3) disc degeneration at each lumbar level, (4) canal stenosis extending the length of the lumbar spine, (5) persistent and essentially unchanged broad-based disc herniation at the L1 level, and (6) persistent and essentially unchanged central and right parasagittal disc herniation at the L3 level.  (Tr. 513.)

The ALJ does not sufficiently explain how, in light of the above evidence, "the longitudinal history of objective evidence" supports the rejection of Dr. Waters' opinions.  The Sixth Circuit has made clear that an ALJ's conclusory and unexplained statement that a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for rejecting these opinions.  *See, e.g., Friend v. Comm'r of Soc. Sec*., 375 Fed. Appx. 543, 552 (6th Cir. April 28, 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.")*; Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 245–46 (6th Cir. 2007) (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Bartolome v. Comm'r of Soc.*

37

*Sec.*, 2011 WL 5920928 (W.D. Mich. Nov.28, 2011) (noting that merely citing to "the evidence" and referring to the appropriate regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue*, 2010 WL 2232309 (N.D.Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097 (S.D. Ohio Apr.23, 2012) (finding the ALJ deprived the court of meaningful review where the ALJ discarded a treating physician's opinion without identifying any contradictory evidence or explaining which findings were unsupported).

Here, while the ALJ recited a large portion of the medical evidence earlier in the decision, she failed to offer any *explanation* for her conclusion that Dr. Waters' opinions were inconsistent with that evidence. This is significant because much of the medical evidence highlighted in the decision (as well as the treatment notes of Dr. Fulop and Dr. Rhiew, which the ALJ does not discuss) appears capable of supporting serious functional limitations. As courts within this District have held, an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physicians were rejected." *Blackburn v. Colvin*, 2013 WL 3967282 at * 7 (N.D. Ohio July 31, 2013). Simply put, this Court cannot conduct a meaningful review and conclude that good reasons have been set forth for rejecting a treating physician's opinion where an ALJ recites some of the pertinent evidence of record and follows that recitation with an unexplained conclusion that said opinion is inconsistent with the medical record. *See Blackburn*, 2013 WL 3977282 at * 7; *Cassels v. Comm'r of Soc. Sec.*, 2016 WL 3097150 at * 4 (S.D. Ohio June 3, 2016) ("The ALJ, for

38

example, 'does not offer any explanation for his conclusion' that "the treating physician's opinions were inconsistent with the medical evidence,' which is enough by itself for error.") (quoting *Blackburn*, 2013 WL 3977272 at * 7); *Sacks v. Colvin*, 2016 WL 1085381 at * 5 (S.D. Ohio March 21, 2016) ("[A]lthough the ALJ made a general statement about inconsistencies between Dr. Bhatia's opinions and the 'medical evidence of record,' it was just that-a general statement devoid of any specific reference to any portion of the medical evidence. Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies.").

 The Commissioner asserts Dr. Waters' opinion that Boughter would need to elevate her legs is not supported by the medical evidence, arguing "the record reflects Boughter does not have significant swelling in her extremities." (Doc. No. 15 at 16.) The Commissioner also argues, somewhat vaguely, that the ALJ properly rejected Dr. Waters' opinion regarding Boughter's need to take unscheduled breaks because "Dr. Waters stated these breaks would be only 'variable' and 'less than 15 minutes.'" (*Id*.) However, the Commissioner cannot cure a deficient opinion by offering explanations never offered by the ALJ. As courts within this District have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn,* 2013 WL 3967282 at * 8; *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue,* 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).

 The Commissioner also suggests the ALJ properly rejected Dr. Waters' opinion because

she appropriately gave significant weight instead to the opinions of state agency physicians Drs. Assaf, Klyop and Stroebel.  The Court rejects this argument. As Boughter correctly notes, Dr. Assaf and Dr. Klyop's opinions were rendered in December 2012, nearly two years before the ALJ decision.  Dr. Stroebel's April 2013 opinion (which like Dr. Klyop's was based solely on a review of the medical record) pre-dated the ALJ decision by over a year and a half.  At the time they rendered their decisions, neither Dr. Assaf, Dr. Klyop or Dr. Stroebel had before them the treatment notes of Drs. Ryan or Fulop.  Nor did they have the benefit of  the MRI results showing "persistent and recurrent" disc herniation and severe stenosis in Boughter's lumbar spine.  Under these circumstances, and in light of the ALJ's failure to address Dr. Fulop's surgical recommendation or the MRI results referenced in Dr. Rhiew's treatment notes, the Court finds this argument to be without merit. [6]

The ALJ's decision fails to set forth good reasons as to why the opinions of Dr. Waters were given "less weight."  Moreover, this portion of the decision is so conclusory and devoid of explanation that it deprives this Court of the ability to conduct a meaningful review.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the

---

[6] Moreover, the Court notes that the ALJ's failure to articulate "good reasons" for rejecting Dr. Waters' opinion is, in and of itself, grounds for remand, regardless of whether there is other evidence in the record to support the RFC.  *See Rogers*, 486 F.3d at 243 ("Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."); *Gayheart*, 710 F.3d at 380 ("[T]his circuit "has made clear that [it] do[es] not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion.").

40

opportunity to sufficiently address the physical functional limitations assessed by Dr. Waters.[7]

*Sentence Six Remand*

In her second assignment of error, Boughter argues new and material evidence warrants

remand.  (Doc. No. 13 at 24.)  The evidence, which is marked as "Exhibit 21F" (and included in

the record before this Court as Tr. 515-590), was submitted to the Appeals Council but does not

appear to have been made part of the record before the ALJ.[8]  This evidence includes records

relating to Boughter's back surgery, which was performed by Dr. Fulop on October 17, 2014.

(Tr. 553-556.)  It also includes the results of imaging of Boughter's lumbar spine, which she

underwent as part of her pre-surgical planning.  (Tr. 566-567.)  Finally, this evidence includes

records relating to treatment received by Boughter at Southwest General Health Center in

---

[7] The Commissioner does not argue that the ALJ's failure to give good reasons for rejecting Dr. Waters' opinion is harmless error in light of the VE testimony at the hearing. Regardless, any such argument is without merit.  The VE testified jobs would be available for a hypothetical individual similar to Boughter who is able to stand/walk for 2 hours, sit for 6 hours, and "able to shift positions every 30 minutes but could keep working during those positions shifts."  (Tr. 80-82.)  While this hypothetical limits the individual to 1 to 2 hours of standing and/or walking, it does not accurately reflect Dr. Waters' opinions that Boughter would need to (1) elevate her legs to waist level while sitting on an "as-needed basis" and (2) take "unscheduled breaks to rest at unpredictable intervals" on a variable basis for up to fifteen minutes for each break.  (Tr. 497-498.) Nor are Dr. Waters' opinions reflected in the VE's testimony that Boughter's past work as a salesperson would be available to an individual working "at the light level" (i.e., standing/walking for 6 hours and sitting for 6 hours in an 8 hour day) who was required to alternate positions every 10 minutes "such that if they were standing they would need to sit down and rest every ten minutes."  (Tr. 85-86.) This hypothetical does not reflect Dr. Waters' opinion that Boughter could only stand/walk for 1 to 2 hours in an 8 hour day, or her opinion that Boughter would need to elevate her legs.

[8] As noted *supra*, at the hearing, the ALJ indicated she would keep the record open for the submission of additional medical evidence.  In the decision, the ALJ states that "additional medical evidence was submitted into the record, which the undersigned has marked as Exhibits 18, 19, and 20." (Tr. 23.)  There is no indication in the decision that the medical evidence marked "Exhibit 21F" was before the ALJ.

September 2014 (for abdominal, flank, and back pain), November 2014 (for back pain radiating through her right lower extremity), and December 2014 (for acute and severe low back pain).

The Commissioner asserts this evidence should not be considered on remand because "Boughter failed to demonstrate that the majority of 21F was new, and failed to demonstrate good cause as to why she did not submit the majority of the records in 21F prior to the decision of the ALJ, issued November 24, 2014."  (Doc. No. 15 at 23.)  The Commissioner also argues these records are not material as the ALJ knew Boughter would likely get surgery and the September and November 2014 hospitalizations were for back pain, "of which the ALJ was well aware."  (*Id.* at 24.)  Finally, the Commissioner maintains the December 2014 hospitalization relates to a later time and, therefore, is not material.

Sentence six of 42 U.S.C. § 405(g) provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence, which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'"  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)).  Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.' " *Id.* (quoting *Sizemore*, 865 F.2d at 711).  *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec.*, 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same).  In

order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (1984). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11.  *See also Bass*, 499 F.3d at 513.  The burden of showing that a remand is appropriate is on the claimant.  *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).

Because this matter should be remanded for reevaluation of Dr. Waters' opinions (which may cause the ALJ to formulate a new RFC), the ALJ should consider all the available evidence that is relevant to those issues.  The undersigned accordingly recommends that the evidence which was submitted to the Appeals Council but not made part of the original record before the ALJ be considered on remand.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be REVERSED and the case REMANDED for further proceedings consistent with this Opinion.

/s Jonathan Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 12, 2016

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**